SH

WO

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Roy Bigelow,

                Plaintiff,

v.

Dorothy Igwe, et al.,

                Defendants.

No.   CV 19-05496-PHX-MTL (ESW)

**ORDER**

Plaintiff Roy Bigelow, who is currently confined in Arizona State Prison Complex (ASPC)-Tucson, Whetstone Unit, brought this civil rights case pursuant to 42 U.S.C. § 1983.  (Doc. 7.)  Defendants move for summary judgment (Docs. 120, 121), and Plaintiff opposes (Docs. 134, 135).[1]

**I.**    **Background**

On screening Plaintiff's First Amended Complaint (Doc. 7) under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an Eighth Amendment medical care claim against Nurse Practitioner (NP) Dorothy Igwe, Starling, Shinn, Corizon, and Centurion based on their alleged failure to treat Plaintiff's Hepatitis C.  (Doc. 8.)  The Court ordered these Defendants to answer and dismissed the remaining claims and Defendants. (*Id.*)

Defendants now move for summary judgment and argue that they were not

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response.  (Docs. 123, 124.)

1    deliberately indifferent to Plaintiff's serious medical need.  (Docs. 120, 121.)

2    **II.    Summary Judgment Standard**

3           A court must grant summary judgment "if the movant shows that there is no genuine
4    dispute as to any material fact and the movant is entitled to judgment as a matter of law."
5    Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The
6    movant bears the initial responsibility of presenting the basis for its motion and identifying
7    those portions of the record, together with affidavits, if any, that it believes demonstrate
8    the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

9           If the movant fails to carry its initial burden of production, the nonmovant need not
10   produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099,
11   1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts
12   to the nonmovant to demonstrate the existence of a factual dispute and that the fact in
13   contention is material, i.e., a fact that might affect the outcome of the suit under the
14   governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable
15   jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.
16   242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th
17   Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its
18   favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,
19   it must "come forward with specific facts showing that there is a genuine issue for trial."
20   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal
21   citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

22          At summary judgment, the judge's function is not to weigh the evidence and
23   determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,
24   477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw
25   all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited
26   materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).
27   ///
28   ///

1

2

### III.    Relevant Facts

####     A.    Plaintiff's Allegations

Plaintiff has had Hepatitis C for approximately 25 years.  (Doc. 7 at 4.)  Prior to his current incarceration, Plaintiff was hospitalized for two months after six feet of his large intestine, half of his stomach, and a portion of his liver were removed, apparently due to gunshot injuries. (*Id.* at 12.)  According to Plaintiff, the practice of ADC and prison medical providers is to delay and deny treatment for serious medical conditions to save money.  (*Id.* at 4.)

Over the past ten years, Plaintiff has continuously complained of worsening medical conditions, including: liver pain, digestive issues, kidney problems, fatigue, joint pain, testicular pain, difficulty urinating, and elevated pancreatic "numbers."   (*Id.* at 4.)  According to Plaintiff, Defendants have refused to treat these issues due to the cost of treatment, rather than medical need, and have ignored Plaintiff's repeated requests for treatment.   (*Id.*)   Plaintiff asserts that Defendant Igwe has assessed him on several occasions, first as a Nurse Practitioner for Corizon and now as a Nurse Practitioner for Centurion.   (*Id.* at 4.)   Plaintiff has repeatedly asked Defendant Igwe to advocate for treatment of his Hepatitis C as it is causing him injury and has led to other "serious medical issues," but Defendant Igwe has informed Plaintiff that he does not qualify for treatment because his "levels are good" and his medical condition is not a priority.  (*Id.* at 4.)

Plaintiff generally asserts that Defendant Igwe failed to timely intervene and treat his Hepatitis C despite his complaints of liver and abdominal pain, joint pain, kidney issues, and fatigue for more than ten years, which have adversely affected him. (*Id.* at 7 ¶ 13.) Plaintiff also asserts alleges that ADC and Shinn had a non-delegable duty to provide adequate medical care under Arizona Revised Statutes § 31-201.01, that they breached that duty as to him, and failed to revise guidelines to remove current exclusions from treatment that jeopardize Plaintiff's life.  (*Id.* at 7 ¶¶ 12, 17 & 14 ¶ 8.)  Plaintiff contends that Defendant Shinn personally approved the policies and guidelines for Hepatitis C treatment. (*Id.* at 14 ¶ 9.)  Plaintiff also asserts that ADC and Shinn violated their own policy requiring

provision to the Health Services Contractor of "the resources to provide constitutionally mandated health care and appropriate referrals for inmates who appear for treatment" and that they have failed to promulgate effective policies and procedures to ensure "adequate" health care. (*Id.* at 7–8 ¶¶ 16, 18.) Plaintiff further claims that "Defendants" have a pattern and practice of failing to provide timely and medically appropriate care to prisoners, including Plaintiff. (*Id.* at 8 ¶ 19.)

### B.     Plaintiff's Medical Care under Corizon

#### 1.     Corizon's Hepatitis C Policies and Procedures

From March 4, 2013 to June 30, 2019, Defendant Corizon was the contracted healthcare provider for ADC prisoners. (Doc. 122 (Corizon Statement of Facts) ¶ 2.) According to a Report published by Gilead Science, the challenges facing prisons in treating the prisoner population infected with Hepatitis C include budgetary constraints, the high cost of treatment, and the fact that incarcerated individuals are up to 13 times more likely to have detectible levels of Hepatitis C in the blood than in the general population. (*Id.* ¶ 4.) Recognizing these challenges, the Federal Bureau of Prisons' Clinical Guidance Manual for the Evaluation and Management of Chronic Hepatitis C (HCV) Infection (hereinafter "BOP Manual"), which was adopted by ADC and Corizon Health, contains a comprehensive framework for prioritizing prisoners for Hepatitis C treatment so that those with the greatest need are identified and treated first. (*Id.* ¶ 5.)

According to the BOP Manual, progression from chronic Hepatitis C infection to fibrosis and eventually cirrhosis may take years in some patients and decades in others, or, in some cases, may not occur at all. (*Id.* ¶ 6.) Most complications from Hepatitis C infection occur in people with cirrhosis; therefore, assessing for cirrhosis is important in prioritizing prisoners for Hepatitis C treatment. (*Id.* ¶¶ 7–8.)

Thus, the APRI score is the "BOP-preferred method for noninvasive assessment of hepatic fibrosis and cirrhosis" and "APRI scores [greater than] 2.0 may be used to predict the presence of cirrhosis." (*Id.* ¶ 9.) However, the APRI score is not necessary for predicting cirrhosis if cirrhosis has been diagnosed by other means. (*Id.* ¶ 10.) The APRI

score is calculated using the results of two blood tests—the AST (aspartate aminotransferase) and the platelet count—and is considered a less expensive and less invasive means of assessing liver fibrosis than a liver biopsy. (*Id.* ¶ 11.) The Gilead Report similarly recognizes that the severity of liver disease in people with Hepatitis C can be estimated using formulas based on common laboratory tests. Two common methods are the aspartate aminotransferase (AST) to platelet ratio (APRI) and the Fibrosis-4 Index. (*Id.* ¶ 12.)

According to the BOP standards, prisoners with "advanced hepatic fibrosis," liver transplant recipients, and those with comorbid medical conditions are the highest priority (Priority Level One) for treatment. (*Id.* ¶ 13.) Advanced hepatic fibrosis is demonstrated through either: (1) an APRI score [greater than] 2; (2) "Metavir or Batts/Ludwig stage 3 or 4 on liver biopsy;" or (3) known or suspected cirrhosis. (*Id.* ¶ 14.) Liver transplant recipients, those with certain co-morbid medical conditions, immunosuppressed patients, and those who were already started on treatment when they were incarcerated also fall into the Priority Level One category. (*Id.* ¶ 15.)

Next, patients in the "intermediate" priority category (Priority Level 2) have an APRI score greater than 1 and/or "stage 2 fibrosis" on a liver biopsy. Those with certain comorbid conditions, including liver disease, diabetes and chronic kidney disease, also fall into the Priority Level 2 category. (*Id.* ¶ 16.)

Finally, those with an APRI score less than 1 are the lowest priority (Priority Level 3) for treatment. Those with stage 0-1 fibrosis on a liver biopsy also fall into this category. (*Id.* ¶ 17.) Because APRI scores are used to predict the presence of cirrhosis, the standards no longer require a liver biopsy. (*Id.* ¶ 18.)

According to the BOP Manual, warning signs of liver inflammation include fatigue, weakness, lack of appetite, nausea, vomiting, jaundice and discolored feces. (*Id.* ¶ 19.) The Gilead Report recognizes that other healthcare providers, such as Medicaid, use similar parameters to determine treatment eligibility, such as fibrosis severity and patient sobriety, in order to "manage cost and utilization of HCV therapy." (*Id.* ¶ 20.) According to the

Gilead Report, the risk of liver failure is greater for people with Hepatitis C who have severe fibrosis (F3) or cirrhosis (F4) than for those with less severe liver scarring. (*Id.* ¶ 21.) A study by the Centers for Disease Control and Prevention (CDC) found that, after five years, about 19% of people with severe fibrosis (F3) developed hepatic decompensation compared with 3.5% of people with moderate fibrosis (F2). (*Id.* ¶ 22.)

In addition to the BOP Manual, Corizon Health also followed the ADC "Clinical Practice Guidelines for the Prevention and Treatment for Viral Hepatitis C. (*Id.* ¶ 23.) The Clinical Practice Guidelines estimate that approximately 23% of ADC prisoners are infected with Hepatitis C. (*Id.*) The Clinical Practice Guidelines state that, in addition to Priority Criteria, treatment considerations will focus on the following: absence of medical contraindications for treatment; stage and grade of disease; absence of risky behavior as evidenced by no disciplinary tickets for drug possession or tattoos for one year; sentence length; and time left to serve. (*Id.* ¶ 24.) The Clinical Practice Guidelines memorialize the high, intermediate and low Priority Levels contained within the BOP Manual almost verbatim. (*Id.* ¶ 27.) The current version of the Clinical Practice Guidelines also state that prisoners with an APRI score of 0.7 or above and who have findings suggestive of advanced fibrosis (low albumin or platelets, elevated bilirubin or INR) will be prioritized for treatment. (*Id.* ¶ 28.) The previous version of the Clinical Practice Guidelines, effective January 1, 2010, did not contain this provision allowing priority treatment for prisoners with APRI scores 0.7–1.0. (*Id.* at n.6.)

### 2.    Treatment Received Under Corizon

On May 13, 2018, Plaintiff was seen by NP Awaal for his Hepatitis C chronic care appointment. (*Id.* ¶ 30.) It was noted that Plaintiff denied any concerns regarding his Hepatitis C at this time. (*Id.*) His APRI score was documented at 0.944. (*Id.*) Plaintiff was informed that his Hepatitis C was stable and that it would continue to be monitored and this his most recent liver function test was normal. (*Id.*) Routine labs for his Hepatitis C were ordered. (*Id.*)

1    On June 21, 2018, Plaintiff was seen by NP Kary for follow up care regarding lab

2 results from earlier that month pertaining to his complaints of abdominal pain.  (*Id.* ¶ 31.)

3 It was noted that he reported he was doing okay on this date and denied other concerns.

4 (*Id.*)  The Plan/Patient education notes indicate that an iron supplement was ordered in

5 response to his low iron levels, his urine analysis ("UA") labs were reviewed, a repeat UA

6 was performed during the visit (negative), additional labs were ordered, and an abdominal

7 CT was requested to evaluate his pancreas.  (*Id.*)  Plaintiff was assessed with abdominal

8 pain with a note stating "DDX [differential diagnosis] pancreatic cancer, pancreatitis."

9 (Doc. 136-1 at 43.)

10    At a July 7, 2018 appointment, a provider recommended a CT scan; Plaintiff asserts

11 the CT was requested because he had "serious intestinal complications due to scarring"

12 after his intestines, stomach, and liver were partially removed due to gunshot wounds.

13 (Doc. 7 at 14 ¶ 11.)  Corizon denied the recommendation.  (*Id.*)

14    On September 7, 2018, Defendant Igwe met with Plaintiff for follow up care.  (Doc.

15 122 ¶ 32.)  Defendant Igwe explained that an Alternative Treatment Plan ("ATP") was

16 issued in response to the request for an abdominal CT, which indicated the following:

> The medical necessity for CT scan of abdomen to rule out
> pancreatic cancer for non-specific abdominal pain and slightly
> elevated amylase is not met.  No other[] signs or symptoms
> suggestive of pancreatic cancer.  In fact[,] based on
> documentation supplied[,] abdominal pain has resolved and
> abdominal examination is unimpressive.  Amylase in [and] of
> itself can be raised due to multiple causes including liver
> disease and medications. Recommend: 1. following clinically
> 2. treating for GERD/ gastritis 3. KUB [kidney, ureter, bladder
> x-ray].

24 (*Id.*)  Defendant Igwe's documented plan states "Labs ordered: Diagnostic panel 2, lipase,

25 amylase, Ferritin; Resubmit CT of abdomen if pain continues and pancreatic enzymes still

26 elevated; Medication added: Omeprazole (antacid) 20 mg qam [once a day in the

27 morning]."  (*Id.*)  Defendant Igwe's notes further indicate that Plaintiff was agreeable with

28 the plan.  (*Id.*)

On September 14, 2018, Plaintiff submitted an informal complaint stating that he had elevated pancreatic levels, problems urinating, and testicular pain and that he was in a lot of pain. (Doc. 7 at 5 ¶ 4.) In an October 2, 2018 response to Plaintiff's informal complaint, "medical" stated: "Your primary concern is: your elevated pancreas levels, problems urinating, and testicular pain. You have been seen by the provider on 9/7/18. Per the plan notes, 'will resubmit CT abdomen if pain continues and pancreatic enzymes still elevated.'" (*Id.* at 5 ¶ 5.)

Defendant Igwe saw Plaintiff again on November 6, 2018, for a chronic care telemedicine appointment. (Doc. 122 ¶ 33.) Plaintiff complained of chronic constipation and stated that stool softeners were not working. (*Id.*) However, Plaintiff stated that he had a "soft" bowel movement that day. (*Id.*) Defendant Igwe ordered Lactobacillus Acidophilus daily, to add bacteria to Plaintiff's intestine. (*Id.*) Defendant Igwe noted that an abdominal and pelvic ultrasound was ordered. (*Id.*) Plaintiff's APRI score as documented as 0.9. (*Id.* at 154 (Corizon Ex. K).)

On November 10, 2018, an x-ray of Plaintiff's abdomen showed increased fecal material, but no evidence of mechanical obstruction or free air. (Doc. 122 ¶ 34.)

On December 20, 2018, Plaintiff saw Defendant Igwe for follow up care, at which time Plaintiff stated that he thought he had a hernia. (*Id.* ¶ 35.) Plaintiff also complained of testicular and abdominal pain. (*Id.*) He denied abdominal or scrotal swelling/fever/chill/nausea/vomiting/diarrhea, and he confirmed he had a bowel movement that morning. (*Id.*) Defendant Igwe reviewed the ATP'd ultrasound which stated: "Medical necessity for [ultrasound] of right lower quadrant [ultrasound] is not documented. Recommend: obtaining history, ROS, initial diagnostics (labs) to determine necessity for further imaging." (*Id.*) Defendant Igwe documented that Plaintiff had recently refused his prescribed constipation medications. (*Id.*) The following medications were added: Lactulose Solution 15 ml—give 30 ml twice per day; change Docusate Sodium—change to directly observed therapy to monitor compliance given prior non-compliance; KEEFE Tylenol 650 mg three times per day as needed for pain. (*Id.*) Defendant Igwe noted that

Plaintiff was agreeable with the plan.  (*Id.*)  The records also indicate that when the results of KUB (abdomen x-ray) was reviewed, Plaintiff stated, "I do not have constipation." (*Id.*)

On 1/2/2019, 1/3/2019, 1/10/2019, and 1/11/2019, Plaintiff refused his Colase (Docusate Sodium) as prescribed for his constipation.  (*Id.* ¶ 36.)

On February 21, 2019, Plaintiff saw Defendant Igwe for follow up care, and Plaintiff complained of constipation, moderate right upper quadrant pain, and nausea.  (*Id.* ¶ 37.) Defendant Igwe noted that Plaintiff had a bowel movement that morning, and that he denied other concerns.  (*Id.*)  Defendant Igwe added Docusate Sodium 100 mg bid prn/Lactulose 30 ml bid prn for Plaintiff's constipation and add Promethazine HCL 12.5 mg bid prn for Plaintiff's nausea; the following labs were ordered: Diagnostic panel 2, urine dipstick, hemoccult, CMP, lipase, and amylase.  (*Id.*)  Defendant Igwe noted that an ultrasound of Plaintiff's abdomen would be considered if his pancreatic enzymes remained elevated.  (*Id.*)

On March 27, 2019, Defendant Igwe saw Plaintiff for a provider follow up care appointment, and Plaintiff complained of constipation, although he reported having a bowel movement that morning, as well as back pain, abdominal pain, and chills, which he reported as ongoing over the past year; he also reported occasional nausea and vomiting. (*Id.* ¶ 38.)  Plaintiff requested an offsite consult for an "abdominal scan."  (*Id.*)  Additional labs, stool analysis, and an x-ray of his abdomen were ordered, and Psyllium Husk (Metamucil) 0.52 grams daily was added to his medications.  (*Id.*)

On April 17, 2019, Defendant Igwe saw Plaintiff for a provider follow up care appointment regarding his abdominal pain.  (*Id.* ¶ 39.)  Plaintiff's abdominal x-ray results were reviewed with him, which showed no free air or bowel obstruction.  (*Id.*)  The documented plan was to request an offsite abdominal ultrasound to further evaluate persistent abdominal pain with slightly elevated pancreatic enzymes.  (*Id.*)

On May 2, 2019, Defendant Igwe saw Plaintiff for his chronic care appointment for Hepatitis C.  (*Id.* ¶ 40.)  Defendant noted that she reviewed Plaintiff's labs, and his exam

1  was unchanged.  (*Id.*)  Defendant Igwe also noted that the offsite ultrasound previously

2  requested was pending Utilization Management review.  (*Id.*)

3  On May 14, 2019, Defendant Igwe saw Plaintiff for follow up care, and Plaintiff

4  reported that he felt a "blockage" in his urethra and that he did "not feel completely empty."

5  (*Id.* ¶ 41.)  Defendant Igwe reviewed the ATP issued in response to the request for an offsite

6  ultrasound, which provided: "Based on information provided, medical necessity not

7  demonstrated at this time.  Inmate without clinical history to support diagnosis of

8  pancreatitis.  Small elevations of lipase and amylase can be elevated secondary to

9  numerous other conditions or underlying co-morbidities."  (*Id.*)  Tamsulosin HCL

10  (Flomax- BPH) 0.4 mg daily and Promethazine HCL 12.5 mg bid prn were ordered, and

11  Prostate Specific Antigen (PSA) labs were ordered to check for cancer, the results of which

12  were normal.  (*Id.*)

13  On June 28, 2019, Plaintiff saw Defendant RN Starling during an unscheduled nurse

14  call.  (*Id.* ¶ 42.)  The notes from this visit indicate that Plaintiff requested to renew his

15  medical diet.  (*Id.*)  Defendant Starling's notes advise that per chart review, Plaintiff's diet

16  was active through December.  (*Id.*)  Plaintiff stated that his current medication, Colace

17  and Lactulose, were helping his constipation, and that he was having daily bowel

18  movements, but said he did not feel he was emptying bowels fully.  (*Id.*)  Defendant

19  Starling documented that Plaintiff had these problems since his gastrointestinal surgery

20  that was due to a gunshot wound.  (*Id.*)  Defendant Starling noted that Plaintiff's exam was

21  unchanged, and that he had a non-tender abdomen and positive bowel sounds.  (*Id.*)  She

22  then referred Plaintiff to the provider, educated him to take all medications as prescribed,

23  maintain good hydration, increase fluids, told him to notify security of urgent symptoms,

24  and to submit Health Need Requests (HNRs) as needed.

25  On July 1, 2019, Centurion took over as the contracted healthcare provider at ADC

26  facilities.  (*Id.* ¶ 43; Doc. 113 (Centurion Statement of Facts) ¶ 3.)  Defendant Shinn took

27  over as ADC Director on October 21, 2019.[2]

28

[2]   *See*   https://www.kold.com/2019/10/07/governor-appoints-new-arizona-

**C.      Plaintiff's Medical Care under Centurion**

**1.      Centurion's Hepatitis C Policies and Procedures**

Centurion does not use APRI scores to determine Hepatitis C treatment priority. (Doc. 113 ¶ 7.)  Instead, the determination for treatment of Hepatitis C is made according to the patient's fibrosis score.  (*Id.*)  Patients with fibrosis scores of F3 and F4 are prioritized for treatment.  (*Id.*)  F3 indicates advanced fibrosis, and F4 indicates cirrhosis.  (*Id.*)  Centurion will also consider treatment of an F1 or F2 if there is coinfection, such as Hepatitis B or HIV or other co-morbid condition, which increases health risk or may hinder or complicate future treatment of either condition.  (*Id.*)  Additionally, patients who are deemed a high priority for treatment based on Fibrosis score will also undergo further workup to assess for underlying cirrhosis, so that a safe and appropriate treatment recommendation can be made.  (*Id.* ¶ 8.)  Centurion also has a Hepatitis C Specialist who advises regarding testing and treatment of the higher priority patients, as well as a Hepatitis C Committee to additionally review and assess Hepatitis C infected patients.  (*Id.*)

Centurion's Hepatitis C Clinical Guidelines were last updated April 2020 and its process is similar to the triaging of patients for treatment in the community, matching the most recent Hepatitis C Guidelines by AASLD/IDSA (American Association for the Study of Liver Diseases and Infectious Diseases Society of America); these guidelines were published in May 2018 and revised in Fall 2019, namely the sections relevant to treatment of Hepatitis C that may be deferred, as in the prison setting.  (*Id.* ¶ 10.)  Those updated Guidelines center on testing evaluation, counseling, and monitoring in situations like the prison setting, and outline monitoring recommendations for those for whom treatment may be initially deferred, including patients who have lower fibrosis scores or who are in phases of counseling, assessment, and work-up.  (*Id.*)  Centurion also follows the ADC Hepatitis C Guidelines, which are consistent with the more detailed updated AASLD/IDSA guidelines for deferred treatment settings.  (*Id.* ¶ 13.)

_____

department-corrections-director/ (last visited Jan. 19, 2022).

1    The same section of the AASLD guidelines that are specific to the correctional

2    setting were updated in November 2019 and adopted by Centurion.  (*Id.* ¶ 12.)

3                    **2.      Treatment Received Under Centurion**

4        On September 19, 2019, Plaintiff submitted an informal complaint stating that he

5    had been needlessly suffering for a long time and had been denied specialty care for his

6    Hepatitis C and was not receiving any treatment due to a policy of monitoring rather than

7    treating his condition.  (Doc. 7 at 5 ¶ 6.)  Plaintiff requested treatment for his Hepatitis C

8    regardless of the stage of his disease.  (*Id.*)  In a September 27, 2019 response, a Centurion

9    staff member stated: "Your concern has been researched including a review of your

10   medical records.  I am providing you with the following response: Currently Hep C

11   treatment is prioritization [] based on available resources."  (*Id.* at 5–6 ¶ 7.)

12       On September 24, 2019, Plaintiff submitted a grievance requesting treatment for his

13   Hepatitis C.  (Doc. 7 at 6 ¶ 8.)  In a September 30, 2019 response, Facility Health

14   Administrator (FHA) Trina Randall stated that Centurion followed the July 2018 Federal

15   Bureau of Prisons Guidelines and ADC's Health Services Technical Manual Clinical

16   Practice Guidelines.  (*Id.* at 6 ¶ 9.)  Randall stated that both sets of Guidelines provided

17   guidance in prioritizing treatment of Hepatitis C in prisoners based upon their disease stage.

18   (*Id.*)

19       In October 2019, Plaintiff's fibrosis score was 0.54, correlating to F2 level and

20   Inflammation Activity grade A1 indicating minimal activity.  (Doc. 113 ¶ 14.)

21       On March 6, 2020, Plaintiff underwent an off-site bladder cystoscopy, and the

22   results revealed that Plaintiff's urethra was "widely open" with no obstructions, but his

23   bladder outlet was "somewhat bulky."  (Doc. 136-3 at 69.)  It was recommended for

24   Plaintiff to follow up as needed.  (*Id.*)

25       A repeat Fibrosure test on September 29, 2020 revealed a fibrosis score of 0.53,

26   continuing to correlate to F2 level and again A1 or minimal inflammatory activity.  (Doc.

27   113 ¶ 14.)

28

Plaintiff was seen in the Chronic Care Clinic again on October 5, 2020; the results of his most recent Fibrosure test were relayed to him, and his medical provider documented her communication with the Hepatitis C Regional Committee regarding Plaintiff's eligibility for treatment, stating that Plaintiff was not yet prioritized for treatment, but that he could be treated, even if he remains F2, within 2021—specifically, "hopefully we'll be treating F2's within the next year." (*Id.* ¶ 17.)

Plaintiff had abdominal x-rays completed on October 22, 2020, all without significant findings. (*Id.* ¶ 21.)

On November 12, 2020, Plaintiff underwent an abdominal ultrasound, which revealed a normal sized liver at 14.6 cm. with unremarkable echotexture, no hepatic capsular nodularity and no ascites—all which discount presence of significant liver disease or cirrhosis; no masses were identified. (*Id.* ¶ 25; Doc. 113-1 at 80–81.)

On November 17, 2020, the medical provider requested approval for Plaintiff to have an off-site visit to see a gastroenterologist, after presenting the case to a specialist via virtual consultation, wherein the medical provider had discussions with a gastroenterology specialist via RUBICON services available to Centurion's medical providers at the prison. (Doc. 113 ¶ 26.) The referral to gastroenterology was approved, authorized and scheduled for January 16, 2021. (*Id.*)

On December 30, 2020, Plaintiff was sent to the hospital for investigation of recurrent pain and vomiting; a CT scan of Plaintiff's abdomen/pelvis showed gallbladder distention associated with mild biliary tree dilatation, and no obstructive bowel patterns. (*Id.* ¶ 27.) Plaintiff was transferred to a tertiary care center for MRI/MRCP of the abdomen, and the attending physician noted an unremarkable abdominal examination, very mild elevation of liver enzymes consistent with chronic Hepatitis C, but no lab findings indicating cirrhosis, infection or pancreatitis, as pancreatic enzymes were normal. (*Id.*)

An MRI/MRCP of the abdomen was performed on December 31, 2020, which revealed clear lung bases, no focal lesions of the liver, spleen or pancreas, normal adrenal glands and kidneys, no intra-abdominal adenopathy, no gallstones and common bile duct

with no filling defect (that would indicate obstruction or retained stone).  (*Id.*)  Plaintiff was discharged back to the prison on December 31, 2020, with no indication regarding medical necessity for surgery.  (*Id.* ¶ 28.)

On January 16, 2021, Plaintiff was seen by an off-site gastroenterologist who noted Plaintiff's symptoms, surgical history and concluded that his chronic abdominal pain could be multifactorial; the physician recommended a colonoscopy, further assessments, continued treatment for acid reflux, plans to perform an EGD, and continued treatment for chronic constipation.  (*Id.* ¶ 29.)  Plaintiff was scheduled for a colonoscopy and an EGD that same week.  (*Id.*)

Plaintiff underwent a colonoscopy on February 17, 2021, and the results showed "a few large-size uncomplicated internal hemorrhoids," but no polyps or masses.  (Doc. 113-1 at 8.)  Plaintiff also underwent an EGD that same day, and no abnormalities were found. (*Id.* at 30.)

On March 13, 2021, Plaintiff had an off-site gastroenterology follow up, and it was recommended that he undergo an abdominal CT.  (*Id.* at 63.)  A consult request for the abdominal CT was submitted and approved.  (*Id.* at 67–68.)  Plaintiff underwent an abdominal CT on April 13, 2021, and the following findings were noted: "1. Postoperative changes from prior partial gastrectomy and anastomosis with the jejunum in the left upper quadrant.  No evidence of recurrent disease or corn plication.  2. Ectasia of the common bile duct and gallbladder, unchanged and without evidence of acute Larry disease." (*Id.* at 70.)  Notably, Plaintiff's liver was documented as "unremarkable." (*Id.* at 69.)

Plaintiff had a chronic care appointment for his Hepatitis C on March 23, 2021, and his liver enzyme levels were within normal limits.  (*Id.* at 75.)

On May 4, 2021, Plaintiff underwent an abdominal ultrasound, and it showed "[f]ibrofatty changes of the liver," but "[n]o focal mass identified." (Doc. 113-2 at 42.)

On August 17, 2021, Plaintiff underwent a Fibrosure test, and his fibrosis score was documented as "above high normal" at 0.66, or stage F3.  (Doc. 132-2 at 65, 68.)  Plaintiff's

necroinflammatory activity score, which measures liver inflammation, was documented as "above high normal" at 0.40, which indicates minimal/moderate inflammation. (*Id.*)

Without specifying a particular date, Plaintiff asserts that "[m]ost recently," Defendant Igwe informed Plaintiff that he was not a candidate for treatment. (Doc. 7 at 6 ¶ 11.) Plaintiff asked her to "advocate for [him]" and submit a request for treatment, but she refused. (*Id.*) Plaintiff asserts that both Defendants Igwe and Starling told him that he had to be close to liver failure or death before they would consider advocating for and treating him. (*Id.* at 13 ¶ 2.) Defendant Igwe has told Plaintiff that under Corizon and Centurion's policies, he could not receive treatment, enhanced testing such as a baseline workup, or a liver biopsy. (*Id.* at 13 ¶ 1.) According to Plaintiff, on some unspecified date, Defendant Starling told him that his Hepatitis C labs reflect abnormally high levels of liver enzymes reflecting his worsening Hepatitis C status and liver damage. (*Id.* at 13 ¶ 4.)

**IV.   Discussion**

   **A.   Governing Standard**

Under the Eighth Amendment, a prisoner must demonstrate that a defendant acted with "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective prong and a subjective prong. First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Examples of a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; to satisfy the knowledge component, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

Additionally, to prevail on a claim against Corizon and Centurion as private entities serving a traditional public function, or against Defendant Shinn in his official capacity, Plaintiff must meet the test articulated in *Monell v. Dep't of Social Services of City of New*

*York*, 436 U.S. 658, 690-94 (1978).  *See also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities acting under color of state law). Accordingly, Plaintiff must show that an official policy or custom caused the constitutional violation.  *Monell*, 436 U.S. at 694.  To make this showing, he must demonstrate that (1) he was deprived of a constitutional right; (2) Corizon, Centurion, or Shinn had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation.  *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).  Further, if the policy or custom in question is an unwritten one, the plaintiff must show that it is so "persistent and widespread" that it constitutes a "permanent and well settled" practice.  *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

**B.   Serious Medical Need**

There is no dispute that Plaintiff has Hepatitis C.  Further, the available medical records show that Plaintiff's condition is "worthy of comment or treatment[,]" including chronic care appointments, routine blood testing, and abdominal imaging.  *See McGuckin*, 974 F.2d at 1059-60.  Thus, this record supports the finding of a serious medical need.  The Court will therefore consider whether Defendants' actions amounted to deliberate indifference.

**C.   Deliberate Indifference**

**1.   Defendant Igwe**

The record shows that Defendant Igwe had several encounters with Plaintiff between September 2018 and May 2019, during which Plaintiff frequently complained of constipation, abdominal pain, and nausea.  (Doc. 122 ¶¶ 33, 35, 37–39.)  The record also shows that Plaintiff's pancreatic enzymes became elevated in or around February 2019.

(*Id.* ¶ 37.)  In response to Plaintiff's complaints, Defendant Igwe prescribed constipation medications and submitted requests for an offsite abdominal ultrasound, which were ultimately denied by Utilization Management.  (*Id.* ¶¶ 35, 37–38.)  However, the evidence does not show that Defendant Igwe consistently monitored Plaintiff's liver enzyme levels or his APRI score.  Notably, the only time Plaintiff's APRI score was documented during his multiple encounters with Defendant Igwe was on November 6, 2018, when his APRI score was noted as 0.9—a score that, under the Clinical Practice Guidelines, may have prioritized Plaintiff for treatment  (Doc. 122 at 154; Doc. 122 ¶ 28.)  Defendant Igwe saw Plaintiff several times after this date, and Plaintiff's APRI score and liver enzyme levels were not documented in any of her subsequent encounter notes, despite Plaintiff's repeated complaints of constipation, abdominal pain, and nausea, and despite the APRI score being the primary means of determining Hepatitis C prioritization at that time.  Notably, there is no evidence that Defendant Igwe ordered Hepatitis C labs after Utilization Management repeatedly denied consult requests for an abdominal ultrasound based on "lack of medical necessity" even though Plaintiff was experiencing chronic abdominal pain.  (*Id.* ¶¶ 35, 41.)  On these facts, a reasonable jury could find that Defendant Igwe failed to consistently monitor Plaintiff's Hepatitis C status and that this failure amounted to deliberate indifference where Defendant Igwe was aware of Plaintiff's frequent complaints of constipation, abdominal pain, and nausea.  Accordingly, there is a genuine question of material fact as to whether Defendant Igwe deliberately disregarded Plaintiff's serious medical need by not adequately monitoring his Hepatitis C between September 2018 and May 2019, and summary judgment will be denied as to Defendant Igwe regarding the care she provided during that time.

However, the record does not support a deliberate indifference claim regarding the care Defendant Igwe provided to Plaintiff after Centurion took over as the private healthcare provider in July 2019.  As the Court discusses in further detail below, the facts show that Plaintiff's Hepatitis C was consistently monitored by Centurion, and the available evidence does not show that Defendant Igwe deliberately disregarded Plaintiff's

serious medical need after Centurion took over in July 2019. Plaintiff's vague references to encounters with Defendant Igwe that took place on unspecified dates are not sufficient to create a triable issue as to whether Defendant Igwe deliberately disregarded his serious medical need after July 2019. Accordingly, summary judgment will be granted to Defendant Igwe as to the care she provided after July 2019 while working for Centurion.

### 2. Defendant Starling

The evidence does not support an Eighth Amendment claim against Defendant Starling. Plaintiff's medical records show that his only encounter with Defendant Starling occurred on June 28, 2019, during which Plaintiff requested to renew his medical diet, and Defendant Starling noted that Plaintiff's diet was active through December. (Doc. 122 ¶ 42.) Plaintiff reported to Defendant Starling that his current medication, Colace and Lactulose, were helping his constipation, and that he was having daily bowel movements, but said he did not feel he was emptying bowels fully. (*Id.*) Defendant Starling documented that Plaintiff's gastrointestinal issues were due to a prior gunshot wound. (*Id.*) Defendant Starling noted that Plaintiff had a non-tender abdomen and positive bowel sounds. (*Id.*) She then referred Plaintiff to the provider, educated him to take all medications as prescribed, maintain good hydration, increase fluids, told him to notify security of urgent symptoms, and to submit Health Need Requests (HNRs) as needed. (*Id.*)

These facts do not amount to a deliberate disregard of Plaintiff's serious medical need. Even taking as true Plaintiff's assertion that on some unspecified date, Defendant Starling told him that he had to be close to liver failure or death before he would be considered for Hepatitis C treatment, even if his labs showed abnormally high levels of liver enzymes (*see* Doc. 7 at 13 ¶¶ 2, 4.), this did not amount to deliberate indifference where there is no evidence in the record to show that Plaintiff's liver enzymes were elevated at the time he was seen by Defendant Starling, or that at the time Defendant Starling saw Plaintiff, she had reason to believe that Plaintiff had advanced fibrosis and/or cirrhosis and that she failed to respond appropriately. Instead, the record shows that Plaintiff had a single encounter with Defendant Starling and that she referred him to the

provider for further evaluation.  On this record, Defendant Starling's response to Plaintiff's serious medical need did not amount to deliberate indifference, and Defendant Starling will be dismissed from the action.

### 3. Defendant Corizon

As discussed above, the Court has determined that there exist material factual disputes as to whether Defendant Igwe violated Plaintiff's constitutional right to sufficient medical treatment between September 2018 and May 2019 while he was under Corizon's care.  The Court must therefore determine whether Corizon had a deliberately indifferent policy, practice or custom that was the moving force behind the constitutional violation.

A policy is "a deliberate choice to follow a course of action" made by the officials or entity "responsible for establishing final policy with respect to the subject matter in question." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992).  A policy can be one of action or inaction.  *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006).

A "custom" for purposes of municipal liability is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law."  *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).   A plaintiff must show that the challenged action is the "standard operating procedure" of the municipality.  *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (internal quotation omitted).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  While one or two incidents are insufficient to establish a custom or practice, the Ninth Circuit has not established what number of similar incidents would be sufficient to constitute a custom or policy.  *See Oyenik v. Corizon Health Inc.*, No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19, 2017) (a reasonable jury could conclude that at least a dozen instances of defendant Corizon denying or delaying consultations and radiation treatment for cancer patient over a year amounts to a custom or practice of deliberate indifference) (citing *Oviatt*

*By & Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992)).  But "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual."  *Id.*

Here, the record shows that Plaintiff made frequent complaints of abdominal pain, constipation, and nausea while he was under Corizon's care.  But the available evidence does not indicate that Plaintiff's APRI score and liver enzymes were consistently monitored or documented during the relevant time, even though the Hepatitis C protocol at that time relied on these indicators to prioritize prisoners for Hepatitis C treatment and to monitor prisoners for potential progression into advanced fibrosis and/or cirrhosis. Plaintiff's Corizon medical records do not contain any reference to his APRI score after his November 6, 2018 appointment with Defendant Igwe even though he had several appointments after that date and continued to complain of abdominal pain, constipation, and nausea.  Notably, Corizon Utilization Management ATP'd multiple requests for an abdominal ultrasound submitted by Plaintiff's treating providers despite Plaintiff's frequent complaints of chronic abdominal pain, constipation, and nausea, and even after acknowledging that Plaintiff's elevated amylase could be "due to multiple issues including liver disease[.]"  (Doc. 122 ¶ 32.)  On this evidence, a reasonable jury could infer that Corizon had a custom or practice of failing to properly monitor Hepatitis C progression in patients under its care.  *See Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (denying summary judgment where prison officials "ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy"); *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (where the treating physician and specialist recommended surgery, a reasonable jury could conclude that it was medically unacceptable for the non-treating, non-specialist physicians to deny recommendations for surgery), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014).

Moreover, a policy or custom is deliberately indifferent when its inadequacy is obvious and likely to result in the violation of a constitutional right. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). Whether an entity has a policy of deliberate indifference is generally a jury question. *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1194–95 (9th Cir. 2002). In this instance, a reasonable jury could find that a policy, practice, or custom of inadequately monitoring and documenting relevant medical indicators in Hepatitis C patients is obviously inadequate to address individual prisoners' various medical needs and their potential development of advanced fibrosis and/or cirrhosis, and such a policy, practice, or custom could result in the violation of prisoners' constitutional rights. Accordingly, there exists a triable issue of fact whether the Corizon's policy amounted to deliberate indifference.

Finally, a policy or custom is the moving force behind a constitutional violation when it is "closely related to the ultimate injury" and when the plaintiff can "establish that the injury would have been avoided had proper policies been implemented." *Long*, 442 F.3d at 1190 (9th Cir. 2006) (internal quotation marks omitted). In light of the evidence discussed above, there is a question of fact whether Plaintiff's chronic abdominal pain would have been avoided had there been a practice or policy of adequately monitoring patients Hepatitis C indicators.

In short, there is sufficient probative evidence in the record to create a triable issue whether Corizon is liable under § 1983 for a violation of Plaintiff's constitutional rights, and summary judgment as to Corizon will be denied.

### 4.    Defendants Shinn and Centurion

On this record, the evidence shows that Plaintiff received constitutionally adequate treatment for his Hepatitis C while under the care of Defendants Shinn and Centurion. Specifically, the facts show that in October 2019 Plaintiff's fibrosis score was 0.54, correlating to F2 level and Inflammation Activity grade A1 indicating minimal activity. (Doc. 113 ¶ 14.) A repeat Fibrosure test on September 29, 2020 revealed a fibrosis score of 0.53, continuing to correlate to F2 level and again A1 or minimal inflammatory activity.

(*Id.*)  Moreover, while under Centurion's care, Plaintiff was sent offsite to undergo an abdominal ultrasound in November 2020; an abdominal CT scan and abdominal MRI/MRCP in December 2020; a colonoscopy and an EGD in February 2021; and repeat abdominal ultrasounds in April and May 2021; the results of these assessments revealed an otherwise unremarkable liver and did not indicate significant liver disease, cirrhosis, or any other abnormalities relevant to Plaintiff's Hepatitis C diagnosis.  (*Id.* ¶¶ 25, 27; Doc. 113-1 at 8, 30, 69, 70, 80–81; Doc. 113-2 at 42.)  Additionally, Plaintiff had a chronic care appointment for his Hepatitis C on March 23, 2021, and his liver enzyme levels were within normal limits.  (*Id.* at 75.)

These facts do not indicate a deliberate disregard for Plaintiff's Hepatitis C or that Defendant Centurion's response to Plaintiff's serios medical need was medically inappropriate.  Construing the facts in Plaintiff's favor, his most recent Fibrosure test results from August 2021 indicated an elevated fibrosis score (F3) and "above high normal" inflammatory activity.  (Doc. 132-2 at 65, 68.)  But patients with fibrosis scores of F3, must still undergo further evaluation to assess for underlying cirrhosis, and there is no evidence that Centurion disregarded Plaintiff's elevated fibrosis score or stopped monitoring his condition.  (Doc. 113 ¶ 8.)  Further, Plaintiff's most recent abdominal imaging from April and May 2021 did not indicate cirrhosis or advanced fibrosis, so requiring Plaintiff to undergo additional evaluation and review by the Hepatitis C specialist and/or Hepatitis C Committee before approving him for treatment would not amount to a deliberate disregard of his serious medical otherwise be a medically inappropriate plan of care.

For the foregoing reasons, the first element of the *Monell* analysis is not supported by the record as to Plaintiff's treatment while he was under Defendants Shinn and Centurion's care, and summary judgment will be granted to Defendants Shinn and Centurion.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is withdrawn as to Defendants' Motions for Summary Judgment (Docs. 120, 121).

(2)     Defendants Centurion, Igwe, and Shinn's Motion for Summary Judgment (Doc. 120) is **granted**.

(3)     Defendants Corizon, Igwe, and Starling's Motion for Summary Judgment (Doc. 121) is **granted** as to Plaintiff's medical care claim against Defendant Starling, and **denied** as to all other claims.

(4)     Defendants Centurion, Shinn, and Starling are dismissed **with prejudice**.

(5)     Plaintiff's medical care claim against Defendant Igwe is **dismissed with prejudice** as to the medical care Plaintiff received from Defendant Igwe after June 30, 2019.

(6)     The only claims remaining in this action are Plaintiff's medical care claim against Corizon and his medical care claim against Defendant Igwe regarding the medical care Defendant Igwe provided to Plaintiff prior to July 1, 2019.

(7)     This action is referred to Magistrate Judge Camille D. Bibles to conduct a settlement conference as to Plaintiff's remaining claims.

(8)     Defense counsel shall arrange for the relevant parties to jointly call Magistrate Judge Bible's chambers at (928) 774-2566 **within 14 days** to schedule a date for the settlement conference.

(9)     The parties must file a joint status report **within 14 days** following the settlement conference, if it is not successful, proposing dates for a trial setting conference.

Dated this 21st day of January, 2022.


_Michael T. Liburdi_
Michael T. Liburdi
United States District Judge